UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| | * | |
| v. | * | |
| | * | |
| | * | |
| LEONARDO LARA, MERCED NAVARRO | * | Criminal Action No. 1:23-cr-10207-ADB |
| MORFIN, and LEANDRO MARTINEZ, | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Currently before the Court are Defendants Leonardo Lara ("Lara"), Merced Navarro

Morfin ("Morfin"), and Leandro Martinez's ("Martinez") motions to suppress (the "Motions").

[ECF No. 55 (the "Martinez Motion"); ECF No. 56 (the "Lara Motion"); ECF No. 59 (the

"Morfin Motion")].  An evidentiary hearing on the motions was held on May 30, 2024.  For the

reasons set forth below, the Lara Motion, [ECF No. 55], is <u>GRANTED IN PART</u>, and the

Martinez and Morfin Motions, [ECF Nos. 56 & 59], are <u>DENIED</u>.

I.      **BACKGROUND**

The Motions generally relate to evidence seized on April 20, 2022 from (1) a search of

Lara's vehicle in Sturbridge, Massachusetts, [Lara Motion at 1; ECF No. 62 ("Opposition") at 1–

2]; (2) a later search of Martinez's vehicle in Methuen, Massachusetts, [Martinez Motion at 1;

Opposition at 2]; and (3) a bag that had been in Morfin's possession in Methuen and was seized

from Martinez's vehicle, [Morfin Motion at 1–3].

Prior to the date of the searches, in April 2022, the Boston Office of the Drug Enforcement Agency ("DEA") was asked by another DEA office to provide an undercover agent who could act as a courier to pick up money that needed to be laundered. [ECF No. 56-6 ¶ 15; Hr'g Tr. at 5–7].  On approximately April 5, 2022, the Boston undercover agent and an individual later identified as Lara arranged for the undercover to meet Lara in Lawrence on April 11, 2022 to pick up between $200,000 and $300,000 on behalf of a Mexican money broker.  See [ECF No. 56-1 ¶¶ 15–21; ECF No. 56-6 ¶ 15; Hr'g Tr. at 10, 15–16].  The transaction was ultimately cancelled because the money broker communicated that April 11 was too long to wait. [Hr'g Tr. at 16–17, 50–51].  The cancelled transaction was arranged through a series of calls and texts between the Boston undercover and telephone number 978-872-9629 (the "Cell Phone"). [ECF No. 56-1 ¶¶ 15–20; ECF No. 56-2 at 3, 6–7; ECF No. 56-6 ¶ 15; Hr'g Tr. at 14–16, 50–51].

A.     **The Cell Phone**

At a May 30, 2024 hearing on the present Motions, Special Agent Adalberto Garcia ("S.A. Garcia") testified as follows concerning the Cell Phone.

On April 7, 2022, following the cancellation of the scheduled pick up, Boston DEA sought and obtained a warrant to permit them to track the location of the Cell Phone. [ECF No. 56-1 ¶¶ 15–21].  With the benefit of that warrant, on April 11, 2022, S.A. Garcia determined that the Cell Phone was in the area of a two-family home at 7 to 9 Linton Avenue, Methuen, MA (the "Home"). [ECF No. 56-3 at 1].  The next day, S.A. Garcia was surveilling the Home when Lara pulled into the property in a light blue Honda CRV, exited the vehicle, unlocked the door to the Home using a key, and entered. [ECF No. 56-4 at 1–2].  Based on location pings from the Cell

Phone, S.A. Garcia determined that Lara was in possession of the Cell Phone.  See [id. at 2; ECF No. 56-5 at 1–2; ECF No. 56-6 ¶¶ 17–18].

Later that day, a white Honda CRV registered to Martinez (the "Martinez Vehicle") arrived at the Home.  [ECF No. 56-4 at 2].  Martinez exited the vehicle and entered the Home.  [Id.].  Martinez and Lara were later determined to be acquaintances based on a prior DEA investigation.  [Id. at 2–3; ECF No. 56-6 ¶ 23].

On April 19, 2022, the Cell Phone's location data showed that it travelled to Paterson, New Jersey.  [ECF No. 56-6 ¶ 18].  S.A. Garcia and his team did not know exactly why the Cell Phone travelled to Paterson, but S.A. Garcia stated that Paterson, NJ "is a known source city for drug activity and money laundering," and that "[i]n his training and experience, . . . a short trip to Paterson [sic] by L[ara] is consistent with a drug or money pickup."  [Id.].  Lara "remained in Paterson [sic] for only a short time," and then drove to Yonkers, New York, where he spent the night.  [Id.].  Investigators did not physically surveil Lara or his vehicle for any part of this trip, including while the car was parked overnight in Yonkers, until he neared the state border on his way back to Massachusetts.  [Hr'g Tr. at 59–62].

**B.**     **The Search of Lara's Vehicle**

On April 20, the day after the Cell Phone was in Paterson and then spent the night in Yonkers, it was determined that the Cell Phone was traveling back in the direction of Massachusetts.  [ECF No. 56-6 ¶ 18].  S.A. Garcia asked the Massachusetts State Police for a "'wall off' vehicle search" of Lara's vehicle when it crossed back into the state.  [ECF No. 59-2 at 1].[1]  In response, according to his testimony at the May 30, 2024 hearing, State Police

---

[1] In a "wall off" vehicle search, investigators find a reason to pull a car over that is unrelated to the ongoing investigation (e.g., speeding) to prevent the driver from knowing that they are being investigated.  [Hr'g Tr. at 87–88].

Sergeant Steven Durant ("Sgt. Durant"), driving an unmarked state police cruiser, went to

Sturbridge, MA, located Lara's vehicle, and began following it.  [Hr'g Tr. at 86–87].  At around

3:00 PM, at Sgt. Durant's direction, another Massachusetts State Police trooper, Trooper

Figueiredo, driving a marked car, pulled Lara over (the "Lara Vehicle Stop"), [ECF No. 56-6

¶ 19; ECF No. 59-2 at 1–2; Hr'g Tr. at 88–89], for speeding, [Hr'g Tr. at 88–89].

The Lara Vehicle Stop was also captured by body-camera footage.  [ECF No. 56-9 (the

"Trooper Figueiredo Body Cam Footage"); ECF No. 56-10].  In the Trooper Figueiredo Body

Cam Footage, Lara tells the Trooper that he was staying in Manhattan, not Yonkers, and visiting

a girlfriend.  [Trooper Figueiredo Body Cam Footage at 1:55].  After additional questioning,

Trooper Figueiredo called in a dog to sniff the vehicle.  [Id. at 27:45].  Although the dog did not

alert to signify the presence of drugs, [id.], following the dog sniff, officers searched the vehicle,

[id. at 38:20].[2]

As a result of the search, investigators seized approximately $40,000 in cash.  [Hr'g Tr. at

92].  They did not arrest Lara at the time and released him around 4:30 PM.  [ECF No. 56-6

¶ 22].

### C.    Search of the Martinez Vehicle

During the Lara Vehicle Stop, but prior to finding the $40,000, [Hr'g Tr. at 38–40],

officers, including then DEA Agent Kevin Conway who testified during the May 30, 2024

hearing, [id. at 98], began "surveilling the [Home] for any evidence that [Lara] or his associates

might dispose of drugs or cash located there."  [ECF No. 56-6 ¶ 22]; see also [ECF No. 55-3 at

---

[2] When speaking to the canine officer prior to the canine search, Trooper Figueiredo muted his
camera feed.  [Trooper Figueiredo Body Cam Footage at 20:40].  He did so again when they
spoke after the search.  [Id. at 36:24].

1].  Approximately thirty-five minutes after Lara was released, at approximately 5:06 PM, the Martinez Vehicle arrived at the Home.  [ECF No. 55-3 at 2; ECF No. 56-6 ¶ 23].[3]  Martinez and Morfin exited the Martinez Vehicle and entered the Home, with one of them carrying "a red bag that appeared to be empty" (the "Bag").  [ECF No. 56-6 ¶ 24]; see also [ECF No. 55-3 at 3].  Shortly thereafter, they walked out of the Home, with Morfin "carrying the red bag, but this time it looked full."  [ECF No. 56-6 ¶ 24]; see also [ECF No. 55-3 at 3].  Morfin placed the Bag in the Martinez Vehicle while Martinez locked the door to 7 Linton Avenue.  [ECF No. 55-3 at 3; ECF No. 56-6 ¶ 24].

Investigators then approached the two men.  [ECF No. 55-3 at 3].  Morfin ran toward the Home, was caught and then handcuffed.  [ECF No. 55-3 at 3; ECF No. 56-6 ¶ 24].  Martinez did not flee but was detained at the scene.  [ECF No. 55-3 at 3–4].  From outside the vehicle, the agents could see that the Bag contained items consistent with narcotics, [ECF No. 55-3 at 4; Hr'g Tr. at 106 (Agent Conway testifying that it was light out, officers could see through the tint of the Martinez Vehicle windows, and they saw what they believed to be narcotics)], and "upon further inspection" they also found an additional bag with what appeared to be narcotics.  [ECF No. 55-3 at 4; ECF No. 56-6 ¶¶ 24–25].  Ultimately, they found U.S. currency and material that tested positive for cocaine.  [ECF No. 55-3 at 4–5].

## II.      DISCUSSION

### A.      Lara's Motion to Suppress

Lara moves under the Fourth and Fifth Amendments to the Constitution to suppress the money seized and any statements that he made during the Lara Vehicle Stop.  [Lara Motion at 1].

---

[3] The DEA "Report of Investigation" states that between the time that Lara was released and Martinez and Morfin arrived at the Home, there were calls between Lara and a phone later located on Martinez's person.  [ECF No. 55-3 at 2].

With respect to the seizure of the $40,000, the Fourth Amendment to the Constitution protects citizens against unreasonable searches and seizures, and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched."  U.S. Const. amend. IV.  There is a "presumptive rule against warrantless searches," Groh v. Ramirez, 540 U.S. 551, 559 (2004), but there are several exceptions to this rule, including the "automobile exception," see California v. Carney, 471 U.S. 386, 390 (1985); plain view seizures, see United States v. Hernandez-Mieses, 931 F.3d 134, 140 (1st Cir. 2019); and the inevitable discovery doctrine, see United States v. Siciliano, 578 F.3d 61, 68 n.4 (1st Cir. 2009).

Regarding the automobile exception, courts draw a distinction between a home, for example, and an automobile, in part because obtaining a warrant to search an "automobile, for contraband goods" may not be "practicable . . . [as] the vehicle can be *quickly moved* out of the locality or jurisdiction in which the warrant must be sought."  Carney, 471 U.S. at 390 (quoting Carroll v. United States, 267 U.S. 132, 153 (1925)).  Thus, officers may search a vehicle without a warrant when they have probable cause to believe there is contraband inside.  See id. at 392; United States v. White, 804 F.3d 132, 136 (1st Cir. 2015) ("police officers may seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband" (quoting United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014))).

Probable cause "exists when the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found."  White, 804 F.3d at 136 (internal quotations omitted) (quoting Silva, 742 F.3d at 7).

> The test for probable cause is not reducible to precise definition or quantification. Rather, the standard is satisfied when the totality of the circumstances create a fair probability that . . . evidence of a crime will be found in a particular place.  All that is required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act.

Id. (internal quotations and citations omitted).  More specifically, evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."  Texas v. Brown, 460 U.S. 730, 742 (1983) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

Here, Lara makes three arguments in support of suppressing the $40,000 found in his vehicle: (1) police stopped his vehicle without probable cause; (2) "Trooper Figueredo extended the scope and duration of the stop without reasonable suspicion"; and (3) "[l]aw enforcement officers did not have probable cause to search [Lara's] car."  [Lara Motion at 1].

The government appears to rest its probable cause argument entirely on the narcotics investigation, and not on the fact that Lara was pulled over for speeding.  See [Opposition at 14–19].  Accordingly, the Court limits its review to whether officers had probable cause leading up to the Lara Vehicle Stop.[4]

Lara argues that the officers did not have probable cause to search the vehicle based solely on the fact that a phone that was likely in Lara's possession "was tracked traveling to Paterson [sic], NJ, a city which [S.A.] Garcia claimed was known for drug activity and money laundering, for a visit that [S.A.] Garcia believed was too short to be lawful."  [Lara Motion at 22].  The government responds that the following facts, among others, supported probable cause

---

[4] Even if the Court did consider Lara's first and second arguments, they are unavailing for largely the same reasons that the First Circuit explained in White.  There, officers had been investigating the defendant for drug trafficking, relied on a pretextual stop of his vehicle, and then called in a canine to search the car.  See White, 804 F.3d at 133–34, 138.  The First Circuit found that although the pretextual stop and use of a canine "in an effort to gain [] more probable cause" than they already had "rendered th[e] investigation and the ensuing criminal prosecution unnecessarily complicated[,] . . . neither the pretextual traffic stop nor the canine sniff search undermine[d] the basic finding that, at the time that these events transpired, officers had adequate probable cause to stop [the defendant]'s vehicle and to search it for evidence of drug dealing activity," and that "the automobile exception and the Fourth Amendment require[s] nothing more."  Id. at 138.

for the search of Lara's car: (1) the April 5 text exchange concerning the cancelled laundering of $230,000 which suggested that Lara was a "high-level courier" of money for drug trafficking organizations, (2) the fact that Lara had previous convictions for bank robbery and money laundering, (3) that he traveled to "Paterson, New Jersey, which S.A. Garcia knew 'to be a "source city for drug activity and money laundering,"'" and (4) he stayed there for only a few minutes, which S.A. Garcia believed was "consistent with a drug or money pickup."  [Opposition at 15–16].

Based on the investigation of Lara leading up to his trip to Paterson, see, e.g., [ECF No. 56-1 ¶¶ 15–21; Hr'g Tr. at 62], and S.A. Garcia's law enforcement knowledge regarding Paterson, see, e.g., [ECF No. 56-6 ¶ 18], the Court finds that investigators reasonably believed that Lara traveled to Paterson to drop drug money off and/or pick money up.  See Brown, 460 U.S. at 742; White, 804 F.3d at 136.  As to whether he actually left with drug money, S.A. Garcia testified that in his experience, "drug traffickers" do not "travel from Massachusetts, pick up contraband at one place . . . then drop it off at another place in the New York area and then return empty handed."  [Hr'g Tr. at 35].  That said, no officers were physically surveilling the car while it was in Paterson, see, e.g., [id. at 59–60], they could not say whether Lara dropped something off and/or picked something up in Paterson, see, e.g., [id. at 66], they did not physically surveil the car when Lara drove to Yonkers and stayed overnight, see, e.g., [id. at 61], they did not surveil the car at any point between Yonkers and near the Massachusetts state line, see, e.g., [id. at 60–62], and they could not say whether Lara stopped at any other point along the way, see, e.g., [id. at 59–62].

Considering the totality of the circumstances, the Court finds that investigators did not and could not know whether Lara was dropping money off or picking money up in Paterson.

Similarly, they did not and could not know whether his trip was to pick up or drop off drugs rather than money.  Thus, when Lara left Paterson, investigators did not know whether he had money, drugs or neither in his vehicle.[5]  Moreover, even assuming that the officers reasonably believed that Lara had picked up drug trafficking money in Paterson, the significant amount of time between the stop in Paterson and the Lara Vehicle Stop, during which there was no surveillance of Lara or his vehicle until Lara neared the Massachusetts border, lessens the likelihood that he was still carrying any drug trafficking proceeds the following day.  In other words, the officers could not say whether Lara had delivered the money to someone else between the time he left Paterson and returned to Massachusetts late the next afternoon.[6]  The Court therefore finds that, under the circumstances present here, there was not a "fair probability" that Lara had contraband in his vehicle, and the officers did not have probable cause to search his vehicle.  Contra White, 804 F.3d at 138 (finding probable cause where officers were told that the

---

[5] S.A. Garcia's testimony that "drug traffickers" do not "travel from Massachusetts, pick up contraband at one place . . . then drop it off at another place in the New York area and then return empty handed," [Hr'g Tr. at 35], would carry more weight if the evidence supported a belief that Lara was trafficking drugs, but here the investigation leading up to the Lara Vehicle Stop supported a belief that he was a money launderer, not necessarily a drug dealer, see, e.g., [ECF No. 56-1 ¶¶ 15–21].

[6] The Government argues in a supplemental brief that the Court should consider Lara's previous convictions and investigations relating to money laundering and drug trafficking as providing further support for probable cause to search his vehicle.  [ECF No. 81 at 2].  Though his prior brushes with law enforcement may have supported officers' belief that, for example, Lara travelled to Paterson to launder drug proceeds, officers did not observe him while he was there, or after he left, such that they could determine whether it was likely that he was carrying contraband in his car.  Further, there is little beyond speculation about the prior convictions or investigations that establishes that Lara was a drug trafficker rather than just a money launderer.  See infra.

defendant was about to engage in a drug deal and then had physical surveillance of the vehicle).[7] Accordingly, the $40,000 seized from Lara's vehicle must be suppressed.

Lara has also moved to suppress any statements he made to officers during the Lara Vehicle Stop.  [Lara Motion at 23].  Specifically, Lara argues that he should have been given a Miranda warning because "[t]his was not a routine traffic stop effectuated for the purpose of enforcing the driving laws or issuing a traffic citation," and was instead a one hour and thirty-six-minute stop "made at the request of drug task force agents investigating drug trafficking." [Id.].  Under the totality of the circumstances, he avers, "a reasonable person would understand that he was being held to the [']degree associated with a formal arrest.[']"  [Id. (quoting United States v. Fornia-Castillo, 408 F.3d 52, 63 (1st Cir. 2005))].

Given that Lara does not identify any specific statements made by him that he believes should be suppressed and the government has not identified any statements as being incriminating or useful in its ongoing prosecution, it is possible that neither side actually cares about the statements.  Nonetheless, the Court finds that the record does not establish that Lara was under arrest and there was therefore no need for the officers to give him his Miranda warnings.  See Fornia-Castillo, 408 F.3d 52, 63.  Rather, Lara was asked mundane questions, there was no force used by the officers including the use of handcuffs or other restraint, see generally [Trooper Figueiredo Body Cam Footage], and he was released from the traffic stop without being arrested, see [ECF No. 56-6 ¶ 22]; see also United States v. Rasberry, 882 F.3d 241, 247 (1st Cir. 2018) (in "distinguishing between temporary detentions and de facto arrests,"

---

[7] The fact that Lara was "nervous" is not sufficient under these circumstances to tip the scales back in favor of the officers.  It is not unusual for someone who has been pulled over and detained by law enforcement to display the level of nervousness exhibited by Lara.

courts consider "the length of the detention, the restrictions placed on an individual's personal movement, the force (if any) that was exerted, the information conveyed to the detainee, and the severity of the intrusion." (quoting United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998))). Accordingly, Lara's motion to suppress statements made during the Lara Vehicle Stop is denied.

### B.      Martinez and Morfin's Motions to Suppress

Martinez moves to suppress "[a]ll items recovered from [his] person and" the Martinez Vehicle, [Martinez Motion at 4], and Morfin similarly moves to suppress "all evidence derived from his illegal seizure and search of [the] red bag alleged by law enforcement to be in his possession and the" Martinez Vehicle, [Morfin Motion at 1].  As explained below, Martinez and Morfin were lawfully detained, and even if they weren't, the evidence seized from the Martinez Vehicle was in plain view, and the evidence found with and/or seized from their persons is protected by the inevitable discovery doctrine.

As an initial matter, both Martinez and Morfin focus a substantial portion of their argument on the notion that they were improperly arrested and/or seized at the outset of the incident at the Home.  See [Martinez Motion at 5–18; Morfin Motion at 5–11].  In response, the government argues that their initial detention was justified under Terry v. Ohio, and that the events "quickly morphed into a probable cause arrest" when, "immediately" following the detention, officers "found the narcotics and drug money that would have warranted a full-fledged arrest" in the Martinez Vehicle.  [Opposition at 22]; see also [Hr'g Tr. 104–105, 110].

Under Terry and its progeny, "[a] brief investigatory stop 'based on a reasonable suspicion that criminal activity may be afoot does not violate the Fourth Amendment, even in the absence of probable cause.'"  Rasberry, 882 F.3d at 246 (quoting United States v. Pontoo, 666 F.3d 20, 27 (1st Cir. 2011) (citing Terry v. Ohio, 392 U.S. 1, 29–30 (1968))).

Judicial review of a Terry stop involves a "two-step appraisal." Pontoo, 666 F.3d at 26. To begin, the stop must be justified at its inception. See United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998). Then, as the stop proceeds, the officers' actions must be "reasonably related in scope to the circumstances which justified the interference." Id. (quoting United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)).

Id. at 247. Though "there are no 'scientifically precise benchmarks for distinguishing between temporary detentions [under Terry] and de facto arrests'" that require probable cause, id. (quoting Morelli v. Webster, 552 F.3d 12, 20 (1st Cir. 2009), whether a detention is a Terry stop or an arrest requires "[a]n inquiry into the totality of the circumstances . . . informed by the reasonableness of the officers' conduct in light of the situation that they face," id., and "neither the use of handcuffs nor the drawing of a weapon necessarily transforms a valid Terry stop into a de facto arrest," id. at 248 (quoting Fornia-Castillo, 408 F.3d at 64).

Here, officers had been investigating and routinely surveilling Lara and the Home prior to the date of the seizure, see, e.g., [ECF No. 56-1 ¶¶ 15–21; ECF No. 56-3 at 1; ECF No. 56-4 at 1–2], and had identified Martinez as an associate of Lara's who had access to the Home, [ECF No. 56-4 at 2–3; ECF No. 56-6 ¶ 23]. On April 20, after having stopped Lara, but prior to finding the $40,000 in his car, [Hr'g Tr. at 38–40],[8] officers set up surveillance of the Home to see if "[Lara] or his associates might dispose of drugs or cash located there" following the car stop. [ECF No. 56-6 ¶ 22]. Martinez arrived at the Home shortly after that, briefly went inside with the empty Bag, and then exited with the same Bag apparently full, and placed it in the Martinez Vehicle. [ECF No. 55-3 at 2–3; ECF No. 56-6 ¶¶ 23–24]. When officers approached Martinez and Morfin, Morfin fled. [ECF No. 55-3 at 3; ECF No. 56-6 ¶ 24]. Under the totality

---

[8] The Court notes that given the timing of events, the decision to surveil the Home, and any evidence obtained as a result of that decision, were not dependent on the officers having seized the $40,000 from Lara's Vehicle, or any statements made by Lara during the course of the vehicle stop.

of these circumstances, officers had, at the very least, a reasonable suspicion of wrongdoing that was sufficient to approach and detain Morfin and Martinez.  See Rasberry, 882 F.3d at 246; see also Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (finding that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion" and "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

Within moments of detaining Morfin and Martinez, [Hr'g Tr. at 104–105, 110], officers saw, in plain view from the street, what they perceived to be narcotics in the Martinez Vehicle, [id. at 106; ECF No. 55-3 at 4; ECF No. 56-6 ¶¶ 24–25].  Under the plain view exception to the Fourth Amendment's warrant requirement, officers may "seiz[e] . . . an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself."  Hernandez-Mieses, 931 F.3d at 140 (quoting United States v. Gamache, 792 F.3d 194, 199 (1st Cir. 2015)).  Here, officers were lawfully present in a place where they could see inside the Martinez Vehicle, and they had probable cause to believe that narcotics were inside, White, 804 F.3d at 136 (probable cause "standard . . . satisfied when the totality of the circumstances create a fair probability that . . . evidence of a crime will be found in a particular place[]"), which gave them a lawful right to access the vehicle, id. ("[P]olice officers may seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband.").

Finally, regarding the evidence found with and/or seized from Martinez and Morfin's person, including cell phones and keys to the Martinez vehicle and Home, [ECF No. 55-3 at 4], even assuming that their seizure and search was unlawful, the evidence obtained from them is protected by the inevitable discovery doctrine.  "Under the inevitable discovery doctrine,

unlawfully obtained evidence that 'inevitably would have been discovered by lawful means' is admissible." Siciliano, 578 F.3d at 68 n.4 (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). "[T]he government bears the burden of showing, by reference to demonstrated historical facts and by a preponderance of the evidence, that the information or item would inevitably have been discovered by lawful means." United States v. Delgado-Pérez, 867 F.3d 244, 258 (1st Cir. 2017) (quoting United States v. Infante-Ruiz, 13 F.3d 498, 503 (1st Cir. 1994)). "[I]n evaluating whether the government has met this burden, [the Court] consider[s] whether 'the lawful means of [evidence's] discovery are independent and would necessarily have been employed' absent the earlier unlawful search, and whether 'discovery by that [lawful] means is in fact inevitable.'" Id. (quoting United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994)). The government must also show that the application of the doctrine in this "particular case will not sully the prophylaxis of the Fourth Amendment," Zapata, 18 F.3d at 978, or in other words, will not "encourage police misconduct." United States v. Soto-Peguero, 978 F.3d 13, 21 (1st Cir. 2020).

Here, the government has shown by a preponderance of the evidence that even if officers had waited to search Martinez and Morfin and seize their possessions, they still would have discovered the narcotics in plain view, see, e.g., [Hr'g Tr. at 106 (Agent Conway testifying that it was light out, officers could see through the tinted windows, and  saw what the believed to be narcotics)], and then would have had probable cause to arrest them and search them pursuant to their arrest. See United States v. Almeida, 748 F.3d 41, 49 (1st Cir. 2014) (finding that "the contents of [a] wallet inevitably would have been discovered and seized by an independent, lawful means when [defendant] was processed" after an arrest). Moreover, the facts here do not support a finding that officers engaged in any misconduct that would "sully the prophylaxis of the Fourth Amendment," Zapata, 18 F.3d at 978; see also Almeida, 748 F.3d at 49 ("application

of th[e inevitable discovery] exception will not 'provide an incentive for police misconduct or significantly weaken constitutional protections'" where defendant was "arrested . . . for reasons unrelated to the [evidence found on his person]." (quoting <u>United States v. Almeida</u>, 434 F.3d 25, 28 (1st Cir. 2006)).

In sum, Martinez and Morfin were validly detained, and any evidence seized thereafter on their person or in the Martinez Vehicle was in plain view and/or would have inevitably been discovered.  Accordingly, Martinez and Morfin's motions to suppress are denied.

**III.      CONCLUSION**

Accordingly, for the reasons described above, Lara's motion to suppress, [ECF No. 56], is <u>GRANTED</u> insofar as the $40,000 seized from his vehicle is suppressed and is otherwise <u>DENIED</u>.  Martinez and Morfin's motions to suppress, [ECF Nos. 55 & 59], are <u>DENIED</u>.

**SO ORDERED.**

July 3, 2024                                                          */s/ Allison D. Burroughs*_____
                                                                        ALLISON D. BURROUGHS
                                                                        U.S. DISTRICT JUDGE